## HUBBARD v. HOAG ET AL.

INSANITY: NOT ESTABLISHED BY THE EVIDENCE.

*Appeal from Hamilton Circuit Court.*

FRIDAY, APRIL 20.

THE plaintiff, Rebecca J. Hubbard, brings this action as guardian of her insane husband, Harrison Hubbard, to procure the restoration of a bond for a deed, surrendered by Hubbard to the defendant, John H. Hoag, after, as is alleged, he became insane. The court dismissed the plaintiff's petition and she appeals.

*J. H. Bradley*, for appellant.

*Chase & Chase*, for appellee.

ADAMS, J.—The bond in question was surrendered in June, 1880, but at what time in June the evidence does not show. During the summer Hubbard began to give unmistakable indications of aberration of mind. He continued in business, however, until near the close of the summer, when his condition became such as to necessitate his withdrawal. He was taken to a hospital for the insane in February, 1881, and in July, 1881, the plaintiff was appointed his guardian. Between the time of the surrender of the bond and the time when the plaintiff was appointed guardian, the land in question had increased in value, and had become worth considerably more than the amount due on the bond.

The question presented is as to whether Hubbard, at the time of making

the contract of surrender, was incapable of making such contract. While upon this question there is some conflict of evidence, we have to say that we think that Hubbard's incapacity is not proven.

Hubbard's residence is in the county of Marshall. . For some years previous to his insanity, he followed the occupation of a herdsman. He was employed by his neighbors to take their cattle to the less settled county of Hamilton, and herd them during the summer upon unoccupied land. In 1879 he seemed to have formed the plan of changing his residence to Hamilton county. With this view, as we infer, he purchased in that county the eighty acres of land in question, paying $150 down, and giving his two notes for the balance, each for $300 payable respectively September 1, 1880, and September 1, 1881, and took a bond for a deed. Not being ready to remove upon and occupy the land, he leased it for the season of 1880 to the defendant, Hoag. On the 11th day of May, 1880, he started from Marshall county on his usual annual herding expedition, gathering his herd for the most part, it appears, as he proceeded on his way. The earliest indication of insanity, as claimed by the plaintiff, occurred at this time. Hubbard was asked by his father how many cattle he expected to have, and answered that he expected a thousand, whereas he obtained more than that the first day, and about eighteen hundred in all. Afterward, as he proceeded with his herd, he came to a railroad, and stopped his herd until an expected train had passed, exhibiting, as is said, undue timidity lest he should not have time to get his herd across. At other times, it is said that he gave contradictory orders, and exhibited a moroseness which had not been noticed before. He was troubled, it is said, with sleeplessness, and had an undue anxiety about his herd, believing sometimes that a considerable number had strayed and become lost, when, in fact, they had not. We cannot detail all the facts relied upon. Some of them do not necessarily indicate insanity; and according to the preponderance of the evidence, we think that he was not insane as early as the surrender of the bond. There is no pretense that the slightest indication was noticed earlier than the 11th day of May, and what is claimed as an indication given upon that day is, to our mind, of no importance whatever. Nor can we attach any importance to Hubbard's timidity about attempting to cross the railroad in advance of an expected train. There is no evidence as to how soon the train was expected, nor how long it takes to cross with such a herd, nor what unforeseen delays, if any, were liable to occur. Hubbard was an experienced herdsman. His employes, who testified to his timidity, it may be, were not.

We think that the most that can be said in regard to his mental condition at the time he surrendered the bond, is that he had begun to be affected with despondency. It seems not improbable that he was passing consciously under the shadow of his impending malady. He had lost his desire to use the land in question as a home, or of following the business of a herdsman. He had evidently become impressed with the importance of curtailing his business and setting his affairs in order. He was not, it is true, very greatly in debt, but we infer from the evidence that he could not conveniently meet his maturing obligations, without creating new ones by resorting to loans, and especially if he were obliged to relinquish business. He showed a great desire to relieve himself from liabilities. This may of course have been the re-

sult of insanity, but the evidence, we think, does not quite warrant us in this conclusion.   It is quite as easy to believe that his desire to relieve himself from liabilities was in view of what he may have realized or apprehended, conceived in the exercise of the soundest judgment.

By the transaction by which the bond in question was surrendered, he canceled at once more than half of his obligations.   And while we think that the land was worth somewhat more than the amount due on it, it was not worth greatly more, and according to the testimony of several witnesses, it was worth but very little, if any, more.  The surrender could not be said to have indicated insanity, if Hubbard had been in the easiest of circumstances.  There is no evidence that Hoag desired the bond should be surrendered.   On the other hand, it is shown that he preferred the money to the land.   He tried after the surrender to get Hubbard's father to take the land, and pay what Hubbard had agreed to pay.

The witnesses who testified to Hubbard's insanity in the early part of the summer are greatly outnumbered by those who testified to his sanity.   Some of the latter, it is true, did not see much of him during the time in question, but others did, and were intimately associated with him.   One of the witnesses called for the plaintiff saw Hubbard nearly every day, and did not notice any change in his mental condition until the middle of July.*   Not only did Hubbard's neighbors entrust him with eighteen hundred cattle, but his employes, who comprise most of the witnesses who testified to his insanity, allowed him to assume such trust, without an intimation to the cattle owners, so far as the evidence shows, that Hubbard was not worthy of such trust, until long after the transaction sought to be set aside.   What is more, he discharged every duty to the cattle owners with marked fidelity and success.

We think that the court did not err in dismissing the plaintiff's petition.

                                                                              AFFIRMED.

---

*It is true this witness seemed to think that Hubbard was insane when the bond was surrendered, but it is evident that he did not know when it was surrendered, but supposed it was after the middle of July.